# IN THE  UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN G. EPPLEY, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PROVIDENT LIFE AND ACCIDENT | : | NO.  10-3942 |
| INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

RONALD L. BUCKWALTER, S.J.                                                April 27, 2011

Currently pending before the Court are Defendant Provident Life and Accident Insurance Company's ("Provident") Motion for Summary Judgment and Plaintiff Stephen Eppley's Cross-Motion for Summary Judgment in the above referenced matter.  For the following reasons, Defendant's Motion is granted and Plaintiff's Motion is denied.

## I.     FACTUAL HISTORY

The crux of the present case centers on a claim by Plaintiff Eppley, under section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), for disability benefits pursuant to an insurance policy administered and funded by Defendant Provident.  Although Provident, under a reservation of rights, paid Plaintiff disability benefits while it investigated the claim, it ceased paying those benefits following completion of that investigation.  The present litigation ensued challenging the propriety of that decision.

In order to conduct the appropriate judicial review of the administrator's decision, a court must look to the record as a whole consisting of all evidence before the administrator when the decision was made.  Doyle v. Nationwide Ins. Cos. & Affiliates Emp. Health Care Plan, 240 F.

Supp. 2d 328, 335 (E.D. Pa. 2003).  As such, the court must first review the administrative record

relevant to the decision in this case.

A.      **The Plan Terms**

In 1993, Plaintiff was an employee of American Insurance Administration, Inc. ("AIA"), and

thus received employee benefits under an ERISA plan, including a Disability Income Policy

("Policy") issued by Defendant Provident and numbered 06-337-B-6091506, effective September 1,

1993.  (Def.'s Mot. Summ. J., Ex. 3; id. Ex. 4, Decl. of William T. Bradley, ¶ 2 (Jan. 24, 2011)

("Bradley Decl.").)  The Policy contained the following pertinent provisions:

> **Total Disability** or **totally disabled** means that due to Injuries or Sickness:
> 1.      you are not able to perform the substantial and material duties of your
>         occupation; and
> 2.      you are receiving care by a Physician which is appropriate for the condition
>         causing the disability.  We will waive this requirement when continued care
>         would be of no benefit to you.
> . . .
>
> **your occupation** means the occupation (or occupations, if more than one) in which
> you are regularly engaged at the time you become disabled.
> . . .
>
> **Residual Disability or residually disabled**, during the Elimination Period,[1] means
> that due to Injuries or Sickness:
> 1.      you are not able to do one or more of your substantial and material daily
>         business duties or you are not able to do your usual daily business duties for
>         as much time as it would normally take you to do them;
> 2.      you have a Loss of Monthly Income in your occupation of at least 20%; and
> 3.      you are receiving care by a Physician which is appropriate for the condition
>         causing disability.  We will waive this requirement when continued care
>         would be of no benefit to you.
>
> After the Elimination period has been satisfied, you are no longer required to have a
> loss of duties or time.  **Residual Disability** or **residually disabled** then means that

---

[1] The "Elimination Period" is "the number of days of disability that must elapse in a period of
disability before benefits become payable."  (Def.'s Mot. Summ. J., Ex. 3.)  In this Policy, the
Elimination Period was ninety days of Total and/or Residual Disability.  (Id.)

as a result of the same Injuries or Sickness:
1.      you have a Loss of Monthly Income in your occupation of at least 20%; and
2.      you are receiving care by a Physician which is appropriate for the condition causing the Loss of Monthly Income. We will waive this requirement when continued care would be of no benefit to you.

. . .

ADDITIONAL EXCLUSION(S)

In addition to the exclusions contained herein, this policy does not cover loss caused by:

ANY INJURY TO OR DISEASE OF THE SPINE, ITS MUSCLES, LIGAMENTS, DISCS OR NERVE ROOTS.

(Def.'s Mot. Summ. J., Ex. 3.)

## B.     Plaintiff's Claim for Total Disability Benefits

On January 13, 2009, Provident received from Plaintiff a claim for benefits under the Policy, alleging total disability due to his "inability to walk without experiencing pain." (Def.'s Mot. Summ. J., Ex. 5.) He described the condition as follows:

> About 10 years ago, I was diagnosed with advanced arthritis in both my big toes. I had successful surgery and was pain-free for approximately 7 years. The pain returned and increased. 1 ½ years ago I had implant surgery. This was not successful. In October of 2008, the implants were removed from my toes; but the pain has not receded.

(Id.) According to his claim form, dated December 20, 2008, Plaintiff was taking Celebrex "1 per day or as needed." (Id.) He purportedly had not worked over the last two years, except for some contract work. (Id.)

Attached to the claim form was Plaintiff's claimant statement, setting forth the following:

> The policy became effective in 1993 when I was the Vice President of American Insurance Administrators (AIA). As my income increased, I accepted some of your company's offers to increase my monthly disability amount. During my tenure with AIA I was mainly an outside salesman who wrote insurance for manufacturers, contractors, and wholesalers. In this capacity, I toured job sites and manufacturing plants. During my last years with AIA, I was earning in excess of $90,000 annually.

In 1997, I was experiencing a great deal of pain [in] both my "Big Toes". After reviewing my x-rays, an orthopedic surgeon said that I had advanced arthritis in both of my big toes. He didn't operate on toes so I had a surgery done by Dr. Dee Stelmach of Apple Hill Podiatry . . . . I was without pain for 7 years. Then, very slowly, it returned.

In 2002, I left AIA after 10 years of employment to join with my fiancee in our strategic marketing firm. In this capacity, we called on clients at their locations and toured their facilities. I functioned as an outside salesperson, collection agent, photographer, and delivery person. My income decreased geometrically from what I was earning at AIA. During my early years at BRIGHT IDEAS, I earned $10,000 - $14,000 annually.

I contacted UNUM Provident to inform them of my income decrease. I was told by a claims person that should I become disabled, my Disability Benefit of $4300/mo would be paid regardless of what I was currently earning. I elected not to reduce my disability premium.

By June of 2007, I had reduced or eliminated most activities that involved walking or standing. The arthritic pain in both my big toes continued to worsen. I did part time work but earned no appreciable income for 2007.

In December of 2007, implants were placed surgically in both my big toes. This procedure was not successful. I healed well, but the pain continued. In October of 2008, my implants were surgically removed and something else was done (my medical records are attached). I was told that the arthritis was gone. However, the pain continues. I was prescribed Celebrex for pain and I take over the counter medication as needed.

When I walk or stand, I experience pain. The longer I walk or stand, the worse the pain becomes. For many years, I was an outside insurance salesman. I can no longer be an outside insurance salesman of any kind.

Please consider this cover letter and the enclosed forms as my claim for full disability . . .

(Def.'s Mot. Summ. J., Ex. 6.)

Also included with Plaintiff's Statement were reports by treating podiatrists David F. Baskwill, DPM and Dee Stelmach, DPM, both from Apple Hil Podiatry. (Def.'s Mot. Summ. J., Ex. 7.) The report from Dr. Baskwill indicated that he last examined Plaintiff on December 15, 2008, and he was to follow up with him on January 5, 2009. (Id.) Under the heading "Restrictions

(activities patient should not do)," Dr. Baskwill wrote, "No standing or walking for work. Weight bearing causes pain." (Id.) Under the heading "Limitations (activities patient cannot do)," he wrote, "No standing or walking for work." (Id.) He further remarked that Plaintiff ceased working on October 17, 2008 because of the condition. (Id.) With respect to the current treatment program, Dr. Baskwill wrote, "Continue with f/u at Apple Hill Podiatry, possible new orthotics." (Id.)

Dr. Stelmach provided two separate statements. The first, dated December 29, 2008, was issued in connection with his 1997 outpatient surgery (bilateral hallux rigidus correction with cheilectomy, debridement and release of the first metatarsophalangeal joint). The doctor remarked that Plaintiff had decreased range of motion and a painful right foot, and was prescribed Vicodin taken as needed for post-operative pain. (Id.) This statement listed no restrictions or limitations and, in fact, indicated that, as of January 29, 1998, Plaintiff was discharged to activities of daily living. (Id.) The second statement, dated December 30, 2008, noted that Dr. Stelmach had last examined Plaintiff on May 13, 2008. (Id.) It opined that Plaintiff had no restrictions or limitations, and could sit, stand, and walk eight hours per work day. (Id.) As of three months after his December 2007 operation, Dr. Stelmach had advised Plaintiff to return to work. (Id.)

As further support for his claim, Plaintiff also provided an Employment Statement, which indicated that his last employment was with Bright Idea Marketing and Communications, Inc., a company in which he had a forty-nine percent ownership interest. (Id.) He remarked that he had not worked full time in two years due to his disability and that his "inability to walk and stand w/out pain detracts from or eliminates job performance." (Id.) Although his job required no lifting, carrying, pushing/pulling, climbing, balancing, bending/stooping, kneeling, squatting/crouching, crawling, reaching, use of foot control, twisting, or hand use, it did involve use of the computer, phone and fax, walking, standing, and wearing dress shoes. (Id.) Finally, Plaintiff explained that he had a bachelor of arts in sociology and was still "for a while longer, a licensed insurance agent."

(Id.)

### C.     The Beginning of Provident's Investigation of Plaintiff's Claim

On January 14, 2009, Defendant wrote to Plaintiff to acknowledge receipt of his request for Individual Disability benefits. (Def.'s Mot. Summ. J., Ex. 9.) The letter indicated that a Disability Benefits Specialist ("DBS") had been assigned to review Plaintiff's file and then contact him to discuss the claim. (Id.) Further, he would be required to provide requested medical, financial, and occupational documentation. (Id.) Finally, the letter advised Plaintiff that if he disagreed with Provident's determination of his medical restrictions and limitations, he would have the right to request an Independent Medical Examination ("IME"). (Id.)

Provident then obtained a Comprehensive Business Report on Bright Ideas, dated January 15, 2009. (Def.'s Mot. Summ. J., Ex. 10.) The address was identical to that listed for Eppley on his Claimant's Statement. (Id.) Plaintiff was listed as the vice-president and his fiancee, Karen Saxe, was listed as "Owner, President." (Id.) A Licensed Producer Search of the same date revealed that Eppley had a "Resident Producer Individual" license in Pennsylvania, which was due to expire on April 4, 2009, to sell various types of insurance. (Def.'s Mot. Summ. J., Ex. 11.)

The assigned DBS, Susan Watkins, conducted a telephone interview with Plaintiff on January 19, 2009. (Def.'s Mot. Summ. J., Ex. 12.) In that interview, he confirmed that he did not return to work at the level he was previously after his surgery in December of 2007 and, thus, he considered that to be the date he became disabled. (Id.) Plaintiff stated that he was a forty-nine percent owner of Bright Ideas with his fiancee – a business they opened in 2002. (Id.) He acknowledged that the business, which was operated out of their home, had not taken off like they had hoped. (Id.) Although they originally intended to close it down in January 2008, they kept it open for a couple of clients. (Id.) While he was involved in sales, photography, editing, phone work, and odd jobs, he had not been doing sales work since his disability due to his pain when

standing and walking. (Id.) His fiancee intended to get a "real job," but had yet to be successful. (Id.) Plaintiff also indicated that he unsuccessfully attempted day trading, and he continued to do photography for brochures. (Id.) As to his medical condition, Plaintiff commented that he was pain free for seven years until the pain returned in late 2007. (Id.) He had bilateral outpatient surgery for hallux rigidus on December 14, 2007, but his pain continued after the surgery and he was not able to do his job as he had prior to the surgery. (Id.) On October 17, 2008, he underwent surgical removal of his implants. (Id.) Thereafter, he experienced an inability to walk or stand due to pain, thus inhibiting his sales work which required him to stand. (Id.) Plaintiff explained that he wanted to find a job that involved sitting, with no standing or walking. (Id.) Walking now required his use of Celebrex and, although he had recently been a pall bearer, he did not carry the casket. (Id.) Plaintiff indicated that he had not made any money in his business and lost $16,000 the previous year. (Id.) Finally, Plaintiff admitted that he filed a late notice of claim "as he always thought the pain would abate, but it has not." (Id.)

Ms. Watkins then contacted Darrell Wilt, owner of Life Solution Center and a mental health therapist at a local college, on January 20, 2009. (Def.'s Mot. Summ. J., Ex. 13.) Mr. Wilt stated that he had known Plaintiff for about four years and was familiar with Plaintiff's business. Mr. Wilt remarked that Plaintiff's fiancee did more of the marketing business and that Plaintiff worked with him every other week at his business – both before and after his surgeries – consulting him on basic strategies and sales coaching. (Id.) Mr. Wilt further stated that Plaintiff had to travel to get there and would prop up his foot while working. He also noted that he knew Plaintiff was uncomfortable on his feet and that he was no longer able to do scuba diving, which was an important part of his life. (Id.) When asked if he knew of any group sales presentations that Plaintiff was doing that would have involved standing, Mr. Wilt indicated that he did not. (Id.) He also remarked that he did not know of any other clients of Plaintiff's business. (Id.)

On January 22, 2009, Ms. Watkins wrote another letter to Plaintiff updating him as to the progress on his claim. (Def.'s Mot. Summ. J., Ex. 16.) First, she advised him that, under the terms of the Policy, he was required to provide written notification within twenty days of the onset of disability, which, in his case, was December 14, 2007. (Id.) Yet, he did not provide any notification of his claim until December 1, 2008, which he claimed was due to hope that the pain in his foot would improve. (Id.) She then set out the important provisions of his Policy that he would be required to satisfy prior to receiving Total Disability benefits. (Id.) According to her calculations, he met his elimination period on March 13, 2008, so long as he continued to be disabled as defined by the Policy. (Id.) She advised him of what records Provident had already received, and asked that he provide information regarding other clients and individuals with whom he worked. (Id.) She also requested that he: (1) complete blank Job Description forms for the duties he was performing prior to and after his disability date; (2) provide tax returns and monthly profit and loss statements; and (3) provide a Supplemental Statement. (Id.)

### D.     Podiatry Records

At the end of January 2009, Provident obtained Plaintiff's records from Apple Hill Podiatry. (Def.'s Mot. Summ. J., Ex. 14.) A post-operative report from December 14, 2007 revealed that Plaintiff underwent a cheilectomy and hallux limitus revision with utilizing of titanium great toe hemi implant, performed by Dr. Stelmach. (Id.) He tolerated the procedure well and left the operating room in good condition, with a prescription for Vicodin. (Id.) Thereafter, Plaintiff returned to Apple Hill for fourteen additional visits, through January 15, 2009. (Id.) As of a post-operative visit on December 31, 2007, Plaintiff had good range of motion. (Id.) On April 9, 2008, Plaintiff stated that his feet were no better. (Id.) An October 23, 2008 note stated that Plaintiff was "doing good" with decreased pain, and on October 29, 2008, he was "doing great" with "minimal pain on [range of motion]." (Id.) On November 11, 2008, Plaintiff reported mowing the lawn and

doing some walking.  (Id.)  During the last three visits, Plaintiff continued to complain of pain, but physical examinations and x-rays were fairly unremarkable.  (Id.)

**E.     January 2009 Surveillance Video**

Provident referred Plaintiff's claim for preparation of a surveillance report.  An investigator conducted surveillance over a three-day period on January 29 through January 31, 2009.  (Def.'s Mot. Summ. J., Ex. 19.)  On January 30, 2009, Plaintiff was observed driving and walking in smooth and fluid manner with no signs of physical limitation or walking devices.  (Id.)  On January 31, 2009, the investigator observed Plaintiff going out his front door, walking to the mailbox at the curb, and then jogging back to his house, with no sign of physical limitation.  (Id.)  A more detailed report of the surveillance revealed that Plaintiff was driving at high rates of speed, shopping at a local grocery store where he pushed a shopping cart and loaded bags into his car, "moving in a playful manner" with his dog in the driveway, bending over, walking in a fluid manner with no clear physical limitation, picking up his dog, and going out with the dog in the car.  (Def.'s Mot. Summ. J., Ex. 20; Surveillance Video CD-R marked PLA-CL-000880.)

**F.     Medical Consultant Reviews**

On February 16, 2009, Patricia Clermont, R.N. completed a consultant review for Provident.  (Def.'s Mot. Summ. J., Ex. 21.)  Upon review of the medical records and surveillance report, Ms. Clermont noted that "[t]he medical records support the claimant's reports of a history of pain to his great toes."  (Id.)  She went on, however, to note that, "That said, there is little, if any documentation to explain any functional restrictions or limitations during the period of 12/07-10/08 (the period that the claimant has the implants).  Therefore, I could not support any [restrictions/limitations] during this period, except for a possible reasonable recovery period from the surgery in December of 2007 of approximately three weeks."  (Id.)  She indicated that she would also expect some standing and walking limitations after Plaintiff had the implants removed in 2008.

9

(Id.)  "However, other than these two time periods noted, the medical records do not explain any other periods of functional R/L's (in my opinion)."  (Id.)  Ms. Clermont also remarked that the surveillance video revealed activity "in excess of what [she] would expect based upon claimant's reports."  (Id.)

Thereafter, on February 20, 2009, Jerry D. Beavers, M.D. performed a doctoral review of Mr. Eppley's file.  (Def.'s Mot. Summ. J., Ex. 22.)  He considered the Claimant Statement, the reports from Drs. Stelmach and Baskwill, the surveillance report, and the treatment notes.  (Id.)  He concluded that restrictions and limitations on standing and walking would be supported from the date of Plaintiff's surgery on December 12, 2007 to the discharge on January 16, 2008, and from the date of his surgery on October 17, 2008 to at least his visit on January 5, 2009, but that current and ongoing restrictions and limitations were "unclear."  (Id.)  Dr. Beavers concluded that Plaintiff's "prognosis is excellent for return to some ambulatory activity given that he is already ambulatory." (Id.)

G.      **Plaintiff Clarifies His Claim Period and Submits Supplemental Information**

During a follow-up call by Susan Watkins, Plaintiff clarified that he did not want back benefits, but that he was claiming total disability only from when he submitted his written claim in January 2009.  (Def.'s Mot. Summ. J., Ex. 24.)  When Ms. Watkins indicated that Provident would need additional doctor's forms for the period after January 2009 to document his ongoing restrictions and limitations, Plaintiff stated that he did not have a doctor's appointment scheduled, but would make one.  (Id.)  She thereafter confirmed these discussions via letter dated February 26, 2009.  (Id.)

Dr. Baskwill, Eppley's attending podiatrist, submitted a supplemental statement on March 10, 2009.  (Def.'s Mot. Summ. J., Ex. 26.)  He listed March 4, 2009 as Plaintiff's final visit and wrote "unknown" under Plaintiff's physical capabilities.  (Id.)  In addition, he noted, without

explanation, "unable to return to work," "no standing or walking for work," and "weight bearing causes pain." (Id.)

Plaintiff followed up, on March 4, 2009, with another letter in support of his claim. (Def.'s Mot. Summ. J., Ex. 27.) Although he indicated that his arthritis was first diagnosed in 1997, his first surgical procedure eliminated the symptoms for seven years. (Id.) He had two subsequent surgeries, each time hoping that his pain would again be decreased or eliminated, but ultimately he did not experience such relief. (Id.) He reported his claim within twenty days from the date on which this disability "became real" for him (December 2008), meaning that no additional surgery would eliminate his inability to function as a productive outside salesperson. (Id.) He asked that, when defining the precise contours of his occupation, Provident use his work prior to the second quarter of 2006, at which time he was relatively pain-free and he spent a significant amount in outside sales or "account acquisition." (Id.) After that date, his pain began increasing and he was forced to reduce his sales and other work-related responsibilities. (Id.) More than 80% of his responsibilities involved sales/account acquisition and networking, which required his active participation in Chamber of Commerce and Rotary functions, including ribbon cuttings, business mixers, breakfast meetings, and trade shows. (Id.) All of these events involved standing and walking. (Id.) As leads turned into prospects, he attended new business meetings, wherein he would have to conduct walking tours of the facility and demonstrate "a professional stance and demeanor." (Id.) He did not participate in client meetings and project implementation after the sale was closed. (Id.) In addition, his non-sales responsibilities were minimal including photography for newspapers and brochures, producing events on behalf of clients three and four times a year, occasional delivery services, and sales coaching, all of which involved significant standing and walking. (Id.) Plaintiff concluded that he was no longer able to do account acquisition/outside sales, had resigned from the Rotary as of April 30, 2006, stopped attending all Chamber functions

11

and networking opportunities, and no longer attended initial client meetings, closing meetings, or plant tours. (Id.) He identified only his fiancee Karen Saxe as an individual able to verify his claims. (Id.)

**H.** **Additional Medical Review by Provident**

Provident canvassed twenty-four pharmacies near Plaintiff's home address, and found only one with his name on file. (Def.'s Mot. Summ. J., Ex. 28.) It reflected dates of service on November 22, 2008 and February 15, 2009. (Id.) In response to a follow-up call on this subject, Plaintiff stated that he was prescribed Celebrex, 200 mg and could take one pill two times per day. (Id.) He took the pain medication, however, only when he had to walk a lot. (Id.)

Dr. Beavers provided a follow-up doctoral review of Plaintiff's file on March 13, 2009. (Def.'s Mot. Summ. J., Ex. 30.) Upon reading Dr. Baskwill's latest statement, he opined that, "[i]t is unclear why the doctor would have given [restrictions and limitations] of 'no standing or walking for work' when it is clear that the claimant can stand and walk for his usual daily activities. While, after multiple foot surgeries, he may have some [restrictions and limitations] in how much ambulation/standing he can do, there is no support for the doctor's restriction of 'no standing or walking for work.'" (Id.) Dr. Beavers recommended consultation with a vocational expert regarding Eppley's job demands. (Id.)

On March 16, 2009, Provident received one additional progress note showing Plaintiff's last visit with Apple Hill Podiatry on March 4, 2009. (Def.'s Mot. Summ. J., Ex. 32.) Plaintiff reported continued pain bilaterally and indicated that the shots only helped for a little while. (Id.) Although his orthotics were comfortable, he stated that they did not help much. (Id.) He had pain on palpitation and range of motion, but no edema. (Id.) The note indicated that Plaintiff was referred to a Dr. Marks for a second opinion on his pain. (Id.)

## I.     <u>Additional Vocational Review by Provident</u>

Ms. Watkins contacted Plaintiff on March 16, 2009, seeking tax returns and contact information for people who could independently verify his occupational duties. (Def.'s Mot. Summ. J., Ex. 31.) He provided the name of a person at the Rotary Club and offered to provide some brochures from his photography work. (<u>Id.</u>)

Provident then contacted Roberta (Bert) Oberdick, who was the chairperson of the 350 member Rotary Club in York. Ms. Oberdick indicated that Plaintiff was a member from 1987 through 2006, when he resigned, and was very active with perfect attendance for eleven years at their weekly meetings. (Def.'s Mot. Summ. J., Ex. 33.) She stated that prior to the regular lunches, there would be social time running from fifteen to thirty minutes, during which any networking was conducted. (<u>Id.</u>) She further explained that Plaintiff's activities included working some of the activities, such as the ten-day York County Fair, a Mother's Day fair, and a car wash committee, wherein he sold tickets. (<u>Id.</u>) He was also on the program committee and would select and contact speakers for that activity. (<u>Id.</u>) Finally, Plaintiff was a greeter and did visitor introductions. (<u>Id.</u>)

A March 17, 2009 telephone conversation with Karen Saxe, president of Bright Ideas and Plaintiff's fiancee, revealed that she started Bright Ideas in 2000, and Plaintiff came on board in 2002. (Def.'s Mot. Summ. J., Ex. 34.) Ms. Saxe explained that Plaintiff was no longer involved, except for occasional consulting since the business was operated out of their house. (<u>Id.</u>) He was originally vice president of sales, but stopped his sales activity as early as 2006, as he was physically limited by his pain. (<u>Id.</u>) In the first quarter of 2006, he began reducing his hours to approximately twenty hours per week. (<u>Id.</u>) Prior to then, he was a "schmoozer," photographer, and set up events. (<u>Id.</u>) Further, he got the leads, closed the deals, and worked with the clients. (<u>Id.</u>) He had in excess of twenty-six to thirty client meetings in 2005, but was down to fourteen to fifteen in 2006. (<u>Id.</u>) Because the company did marketing for manufacturers, Plaintiff went to the plants and walked

around their office spaces. (Id.) He stopped working at the end of 2007 and, although he attempted to work at a grand opening event sometime thereafter, he had to leave the event after thirty minutes due to pain. (Id.) At present, she now does all aspects of the business. (Id.) She recommended that Ms. Watkins speak to Daryl Hurst, who was the owner of Realty One Real Estate. (Id.)

Ms. Watkins contacted Darryl Hurst the next day. (Def.'s Mot. Summ. J., Ex. 35.) Although he was familiar with Bright Ideas and Karen Saxe, he did not remember who was involved with the brochure work done by the company. (Id.)

Plaintiff submitted his individual tax returns for 2004 through 2007, and Bright Ideas' tax returns for 2004, 2006, and 2007. (Def.'s Mot. Summ. J., Appendix A.) They showed Plaintiff's income as follows: 2004 - $12,288; 2005 - $6,160; 2006 - $2,699; and 2007 - $812, together with some investment and rental property income.

On April 3, 2009, Plaintiff called regarding the status of his claim and Ms. Watkins asked him about his trading activities. (Def.'s Mot. Summ. J., Ex. 37.) He noted that he did options trading as a "hobby." (Id.) When she observed that he traded over $600,000, short term, he explained that he had always traded and, years earlier, was a stock broker for Horner, Blower. (Id.) He remarked that the trading was only for himself and could not pinpoint how much time he spent doing it. (Id.)

### J.    Expert Vocational Review

Provident had Plaintiff's claim reviewed by Senior Vocational Rehabilitation Consultant, Robert A. Rodecker, M.Ed., CRC, on April 3, 2009. (Def.'s Mot. Summ. J. 36.) Having gone through Plaintiff's entire work history, Mr. Rodecker indicated that he could not yet comment on the walking and standing demands of Plaintiff's position as Plaintiff had not performed sales-related activities since early 2006. (Id.) In addition, he was not sure how busy Plaintiff had been prior to that. (Id.) As he explained, "[t]ax returns for Bright Ideas reflects a company with minimal

14

earnings and with insured's fiancee and business partner now involved with a new venture I question how active insured and company were prior to disability date." (Id.)

**K.        Peer-to-Peer Contact**

On April 8, 2009, Dr. Beavers spoke directly to Dr. Baskwill. (Def.'s Mot. Summ. J., Ex. 38.) Dr. Baskwill indicated to him that Mr. Eppley continued to complain of activity-associated pain in his feet and the surgeries were unsuccessful in relieving this pain. (Id.) Nonetheless, Dr. Baskwill could find no pathology in the feet that would explain the level of pain reported by Mr. Eppley. (Id.) As described in Dr. Beavers's summary, "based on the pain reports, Dr. Baskwill [felt] the claimant [was] limited to standing and/or walking no more than two thirty minute periods per working day." (Id.) After this discussion, Dr. Beavers conveyed to Dr. Baskwill his own opinion that "there is no medical basis for such a severe activity limitation, and the claimant's documented activity level does not suggest such severe activity-associated pain is actually present." (Id.)

On the same date, Dr. Beavers wrote to Dr. Baskwill to confirm that Dr. Baskwill found no pathology to explain Plaintiff's level of pain, but based on the pain reports, felt that Plaintiff was limited to standing/walking no more than two thirty minute periods per working day. (Def.'s Mot. Summ. J., Ex. 39.) Dr. Baskwill signed this letter indicating his agreement with its contents. (Id.)

**L.        Review by G. Lance Matheny, II, M.D., Board-Certified Physician in Orthopedic Surgery**

Dr. G. Lance Matheny, II, a designated medical officer ("DMO"), who is board-certified in orthopedic surgery, reviewed Mr. Eppley's claims file and provided a report on April 10, 2009. (Def.'s Mot. Summ. J., Ex. 41.) Upon being asked to resolve the apparent conflict between Drs. Baskwill and Beavers, Dr. Matheny agreed with Dr. Beavers that the restrictions and limitations provided by Dr. Baskwill were restrictive in relation to (a) the limited clinical findings; (b) the

management of pain with Celebrex; and (c) the activities observed on the surveillance video.  (Id.)

He went on to reason that:

> The restrictions and limitations for standing and/or walking no more than two 30 minutes per day appeared to be based on a description of symptoms and tolerance rather than on loss of functional capacity or risk of injury.  On the video, Mr. Eppley had accommodated the gait abnormalities noted well enough to be able to stand, walk, take a few jogging steps and drive.  He was described by the treating podiatrist as being able to perform all daily activities, including mowing the lawn and raking.

> The clinical information reviewed was consistent with impairment of both feet due to the 1st MTP joint surgeries noted.  The wearing of comfortable shoes, use of orthotics, and limited push-off phase of gait noted on the video were consistent with the clinical findings noted.

> The treating podiatrist described the time out of work after the November foot surgery from 11/14/2007 to 1/16/2008.  He described the time out of work after the October 2008 foot surgery from 10/17/2008 to 1/5/2009.  The clinical information reviewed was consistent with these postoperative periods off work.

> The records described continued bilateral foot pain after the November 2007 surgery, which resulted in the October 2008 surgery.  Records subsequent to the October 2008 surgery described continued bilateral foot pain complaints, despite treatment that included orthotics and intraarticular steroid injections.  From 1/16/2008 to the 10/17/2008 surgery and from 1/5/2009 to the present, the records were consistent with no more than occasional standing and walking throughout the course of an eight hour day, so as to avoid standing or walking for prolonged periods.  Expected accommodations would include wearing comfortable shoes, such as the tennis shoes Mr. Eppley has been wearing, use of orthotics, and the ability to sit periodically throughout the day to relieve discomfort.  I would defer to the vocational staff as to how these restrictions and limitations relate to any specific occupation.

> Recommendations: No further medical investigation.

(Id.)

## M.      Further Expert Vocational Review

Senior Vocational Rehabilitation Consultant, Robert J. Rodecker, conducted a telephone interview with Plaintiff on May 1, 2009, again with respect to his duties at Bright Ideas.  (Def.'s Mot. Summ. J., Ex. 43.)  Plaintiff explained that he left his former employment at AIA Insurance in

2002 to begin working at Bright Ideas and brought with him some known customers to be Bright Ideas' first clients.  (Id.)  His initial duties were all sales-related as that was what he "was good at." (Id.)  More specifically, he was to secure the customer and then his fiancee, Karen, took over to develop a marketing plan.  (Id.)  In connection with this task, he would look for exposure for Bright Ideas, attend Rotary Club meetings and charitable events, and make cold calls. (Id.)  In short, networking was his primary function, all directed towards generating referrals.  (Id.)  In addition to networking, Plaintiff stated that he also functioned as a "sales consultant" doing sales coaching for various customers and, in some instances, actual sales work for which he would bill clients on a time basis.  (Id.)  Plaintiff also performed public relations tasks for customers to generate exposure for them.  (Id.)

Prior to the first quarter of 2006, Plaintiff stated that he was "going at it" full time, forty hours per week primarily performing a sales function.  (Id.)  After the first quarter, he primarily performed cold calls and, due to increased pain, gradually decreased his weekly hours from forty to twenty.  (Id.)  From early 2006 forward, Plaintiff indicated that his function diminished and he cut back on networking activities.  (Id.)  He did not go out anymore to generate referrals and these referrals, in turn, became more limited.  (Id.)  Thereafter, Plaintiff conceded that the sales consulting work never really took off.  (Id.)  He had maybe four clients total "and it never became a big part of what he did."  (Id.)  In its current state, Bright Ideas was a functioning Company with Karen Saxe as its sole employee.  (Id.)  When Mr. Rodecker indicated that the financial information in the file portrayed a company that was struggling, Plaintiff "chuckled and said [he] was being too kind." (Id.)  He said he felt "awful about Bright Ideas . . . [that] this business was never successful. . . . he tried a lot to make it work but it never really took off."  (Id.)

When asked about his current financial status, Plaintiff stated that he was living off his prior income and getting involved in selling himself for drug testing.  (Id.)  He remained a forty-nine

percent partner for Bright Ideas, occasionally handled a phone call, consulted with Ms. Saxe on matters, and consulted for his sole client, Darrell Wilt, in exchange for Mr. Wilt's provision of mental health services for Ms. Saxe. (Id.) He repeated that his decline in hours and duties over the first half of 2006 was gradual and although he "worked hard to make this work . . . [he] was unable to generate the income for the work he put in. . . . the business was never really successful and he was embarrassed by it all." (Id.)

**N.    Management Review of Eppley's Claim and Final Investigation**

Provident submitted Plaintiff's claim for Management Review on May 20, 2009. (Def.'s Mot. Summ. J., Ex. 45.) The reviewer noted that it was difficult to validate the duties of Plaintiff's occupation due to the fact that the business was not successful and, prior to his claim of disability, Plaintiff ceased performing essentially all of the duties of the occupation. (Id.) Although Provident had made multiple efforts to validate Plaintiff's occupational duties, Plaintiff repeatedly indicated that he cut back his hours in the beginning of 2006 without providing any corresponding treatment records between 2002 and July of 2007, thus making his treatment inconsistent with his occupational statements. (Id.) The reviewer suggested that Provident take the following actions: (1) verify that Plaintiff was not treated between 2002 and 2007; (2) ask the vocational expert to piece together the various occupational information obtained to determine the material and substantial duties of Plaintiff's occupation and to note whether there were any inconsistencies with the information received from various sources; and (3) obtain clarification from the designated medical officer regarding the restrictions and limitations provided.

Thereafter, Provident carried out these various directions. On May 21, 2009, Susan Watkins spoke with Dr. Matheny, who opined that Plaintiff could do sedentary work. (Def.'s Mot. Summ. J., Ex. 46.) He noted that Plaintiff could stand up to one-third of the day, for a total of three hours a day spread out over eight hours, but could not stand for an entire three hour block of time. (Id.) He

also indicated that Plaintiff could stand up approximately one hour at a time, and that the accommodations of orthotics would allow him to stand up to the one-third of the day. (Id.) Finally, he remarked that the surveillance video supported the fact that Plaintiff had abnormalities with his gait and was limited to sedentary work. (Id.)

On May 26, 2009, Ms. Watkins spoke with Plaintiff, who stated that he had not been treated by any other physicians. (Def.'s Mot. Summ. J., Ex. 47.) He provided contact information for his physical therapist, where he went for four to eight session prior to his second surgery. (Id.) The physical therapy notes revealed seven visits between June 25, 2007 and October 22, 2007. (Def.'s Mot. Summ. J., Ex. 53.) As of October 22, 2007, Plaintiff unilaterally decided that physical therapy was not helping and should be discontinued. (Id.)

Provident then conducted two more rounds of surveillance on Plaintiff. The first occurred from Monday June 1, 2009 to Wednesday, June 3, 2009. (Def.'s Mot. Summ. J., Exs. 48-49; Surveillance video CD-R marked PLA-CL-00881.) The video revealed Plaintiff driving to a plastic surgery facility, where he entered the building and subsequently left without use of ambulatory assistance; traveling to a YMCA and entering; retrieving a newspaper from his front driveway; driving to various locations and walking without restrictions or use of visible medical devices; and taking in garbage cans. (Id.) The second round occurred from June 8 to June 9, 2009. (Def.'s Mot. Summ. J., Ex. 50; Surveillance video CD-R marked PLA-CL-00882-00883.) This video showed Plaintiff training his dog outside; driving to a dentist's office and to a dog kennel; walking from his car while talking on a cell phone and attempting to enter the office, then returning to his car and leaving; taking his dog to a park near a reservoir area, where he stood near the reservoir, threw sticks into the water for his dog to fetch, stood and played with his dog, and walked back across a bridge for approximately five minutes to return to his vehicle; driving to and entering the YMCA; running multiple errands by car; and standing near a water reservoir for an extended period while

talking to an unidentified male.  (Id.)

Via follow-up analysis, vocational expert Rodecker noted that, in his interviews, Plaintiff could not articulate when he started cutting his hours and had no accounting or records of his hours worked during early 2006.  (Def.'s Mot. Summ. J., Ex. 52.)  Mr. Rodecker also summarized his aforementioned telephone interviews of Karen Saxe on March 17, 2009, Bert Oberdick on March 16, 2009, and Darrell Wilt on January 20, 2009.  (Id.)  Finally, Mr. Rodecker reviewed Plaintiff's own statements as to his job duties.  (Id.)  Based upon this compilation of information, Mr. Rodecker commented that there was consistency in much of the information presented.  (Id.) Plaintiff clearly spent most of his time with Bright Ideas networking and securing customers, after which his partner would take over client handling.  (Id.)  The reports were also consistent that the business never really took off and Plaintiff's duties from 2002 to early 2006 were specific to "account acquisition."  (Id.)  Plaintiff was already a fixture at the Rotary and Chamber of Commerce and used these organizations as vehicles to meet prospective customers.  (Id.)  Nonetheless, Mr. Rodecker noted that "[i]t appears that [Plaintiff's] work after 2006 was minimal and [he] did not play any significant role thereafter.  [Plaintiff] cannot account for his hours and there is limited documentation of his duties during his time with Bright Ideas."  (Id.)  Mr. Rodecker concluded that "it appears [Plaintiff's] duties starting out with Bright Ideas [were] primarily sales work as indicated above; he had other duties that were less substantial such as photography, delivery and sales coaching.  It is difficult to ascertain as insured cannot even articulate a specific timeline when he performed certain duties and when he stopped.  The best information we have is that the primary duty of sales stopped in the first quarter of 2006."  (Id.)

Mr. Rodecker then issued a supplemental occupational analysis to answer the inquiry of whether Dr. Matheny's restrictions of standing up to three hours a day and only an hour at one time, with a limitation to sedentary work, would permit Plaintiff to perform his previous occupational

duties.  (Def.'s Mot. Summ. J., Ex. 54.)  Based on the entirety of his review, he opined that "the physical demands of [Plaintiff's] occupational duties do not exceed the supported [restrictions and limitations] as indicated [by Dr. Matheny]."  (Id.)

### O.        Provident Rejects Eppley's Claim for Disability Insurance

On June 18, 2009, Provident sent Plaintiff a nine-page letter indicating its determination that although he had certain restrictions and limitations, they would not preclude him from performing his pre-disability duties.  As such, he was not eligible for disability benefits under the Policy.  (Def.'s Mot. Summ. J., Ex. 56.)  Upon extensive review of the pertinent provisions of the Policy and the entire background medical and vocational investigation conducted by Provident, the letter indicated that:

> [I]t is our understanding that sometime after the first quarter in 2006 you stopped working on a full time basis for Bright Ideas.  Although you indicated that your foot pain was increasing in 2006 and that was the reason you decreased your activity level with Bright Ideas, we do not have medical records that indicate you sought medical treatment for this foot pain until July 2007.  Therefore, as you did not find the need to seek medical treatment in 2006, it appears that your decision to decrease the amount of time that you worked in 2006 was not due to your disability, but rather from a business that was not profitable.  At some point in 2006 (dates are unclear as to when) to your surgery in December 14, 2007, you continued your affiliation with Bright Ideas, but you were working less than 40 hours a week.  The information that we have further indicates that you were not attending Rotary meetings or making client contacts, as you had done previously.
>
> Although you submitted a claim indicating that you were claiming a disability from your foot condition from the date that you submitted your claim, (January 2009) the records reflect and our medical consultants concur, that there were two periods of time periods [sic] where you would have had restrictions and limitations due to your foot pain.  These time periods were from December 14, 2007 to January 29, 2008 and from October 17, 2008 to January 5, 2009.  In the first period of time for which there are supported restrictions and limitations, you did not meet your Elimination Period.  The second period of time, in which there would have been restrictions and limitations, occurred more than 6 months after the first time period.  According to your policy, a successive disability which occurs 6 months after a disability would require a new Elimination Period.  As such, based on a second date of disability of October 17, 2008, you would not have satisfied your Elimination Period until

January 15, 2009.

As initially, the occupational duties that you were performing prior to your disability were unclear in regard to your disability, we provided you with one month of benefits under a Reservation of Rights while we completed our evaluation. Our evaluation is now complete, and the on-going restrictions and limitations that you have of standing for more than 3 hours and standing up to one hour at a time exceed the occupational duties that you were performing both back to 2006 when you were working full time and after you reduced your hours in 2006. As such, it is our determination that your restrictions and limitations would not preclude you from performing the material and substantial duties of your occupation as a sales person and no further benefits are payable.

(Id.) The letter closed by informing Plaintiff of his right to appeal this determination. Id. Both a manager and a quality compliance consultant reviewed and agreed with this decision. (Def.'s Mot. Summ. J., Ex. 57.) In addition, Ms. Watkins notified Plaintiff by telephone of this decision, at which time they discussed the appeals process. (Def.'s Mot. Summ. J., Ex. 58.)

## P.    The Appeal

On July 17, 2009, Plaintiff sent a responsive letter to Provident indicating that he had consulted with attorneys, but had not yet hired them. (Def.'s Mot. Summ. J., Ex. 59.) He sought a settlement offer in lieu of referral to his attorneys. (Id.) In response, Provident sent a letter dated July 20, 2009, indicating that his letter had not included any new information and that if he wished to appeal, he should do so directly with the Appeals Unit. (Def.'s Mot. Summ. J., Ex. 60.)

Subsequently, Plaintiff's counsel brought suit in the United States District Court for the Middle District of Pennsylvania. Upon discovery that the Policy was governed by ERISA and that Plaintiff had to exhaust his administrative appeal process, the court dismissed the suit without prejudice. (Def.'s Mot. Summ. J., Ex. 61.) Counsel sought a ninety-day extension for submitting the appeal. (Id.) Thereafter, on December 18, 2009, Plaintiff's counsel filed his formal appeal and indicated that it may be supplemented by way of further documentation. (Def.'s Mot. Summ. J., Ex. 62.)

22

On December 21, 2009, Provident received the appeal and advised Plaintiff's counsel that it hoped to make a determination within forty-five days. (Def.'s Mot. Summ. J., Ex. 63.) Laura Mininni, R.N., Sr. Clinical Consultant prepared a request for appeal medical review on January 7, 2010. (Def.'s Mot. Summ. J., Ex. 63.) She reviewed his entire claim file and posed the following question for the medical examiner: "Does there appear to be support for the [restrictions and limitations] (no standing or walking for work) provided by the AP for any period of time since early 2006? If so, please outline which activities the insured would be restricted and/or limited from performing." (Id.)

The Appeals Unit then submitted the claim to Board Certified Orthopedic Surgeon Isadore G. Yablon, M.D., who performed an Appeal Medical Consultant Review on January 17, 2010. (Def.'s Mot. Summ. J., Ex. 65.) Upon summarizing Plaintiff's claims file and medical and vocational records, Dr. Yablon opined, based on reasonable medical certainty, that Plaintiff could "do the work described in the job description but he is able to stand and walk continuously for 3 hours twice during an 8-hour day and do sedentary work for 2 hours during an 8 hour day. . . . [The surgeries] should enable him to ambulate and to run slowly as was visualized on the surveillance videos." (Id.) He agreed that Plaintiff would have had restrictions and limitations in early 2006 because of pain. (Id.) After the second surgery, however, Dr. Yablon found that Plaintiff could work as previously outlined above. (Id.) He concluded that, "[t]he restrictions and limitations which would apply to him in sedentary positions would be doing all work which can be done from a sitting position and not lifting more than 20 pounds from a sitting position. These restrictions and limitations would change 3 months after his second surgical procedure, so that he could do as outlined under the conclusions of this report as of [January 17, 2009]." (Id. (see January 26, 2010 Clarification).) "[T]here would be no restrictions and limitations regarding the sedentary work which he could do for eight hours during an eight-hour working day on a continuous basis if

necessary." (Id.)

Dr. Yablon then prepared an Orthopedic Review Addendum on February 3, 2010. (Def.'s Mot. Summ. J., Ex. 66.) He confirmed, at this time, that Plaintiff had restrictions and limitations requiring sedentary work from 2006 until October 17, 2008, when the prosthesis in his toe was removed. (Id.) Giving Plaintiff three months of recovery, Dr. Yablon believed Plaintiff could return to his usual occupation in January 2009. (Id.)

By way of letter dated February 5, 2010, Plaintiff's counsel again argued that Plaintiff was entitled to disability benefits. (Def.'s Mot. Summ. J., Ex. 67.) Notably, however, counsel provided no further treatment records or evidence. (Id.) Shortly thereafter, a Provident representative called Plaintiff's counsel to confirm that Plaintiff was not seeking any back benefits, but was only claiming disability as of December 2008. (Def.'s Mot. Summ. J., Ex. 68.)

On February 24, 2010, Provident issued its appeal decision confirming that Plaintiff was not eligible for disability benefits. (Def.'s Mot. Summ. J., Ex. 69.) The letter engaged in another extensive review of the claims file and explained the basis for this decision. (Id.) It noted that "as of January 17, 2009, we acknowledge that Mr. Eppley would still have some restrictions and limitations. However, the physical demands of Mr. Eppley's occupation would not exceed his level of work capacity." (Id.)

Plaintiff wrote to Provident on April 15, 2010, stating that he would be filing a civil action. (Def.'s Mot. Summ. J., Ex. 70.) He further indicated that he would not be paying any additional premiums. (Id.)

## Q.  **Procedural History of Present Suit**

Plaintiff filed a civil action in this Court on August 9, 2010, claiming a violation of ERISA, 29 U.S.C. § 1132(a)(1)(B). Defendant served its Answer in September, and the parties proceeded through discovery. Defendant filed the present Motion for Summary Judgment on January 25,

2011.  Plaintiff responded and filed a Cross-Motion for Summary Judgment on February 4, 2011, and Defendant filed its Reply and Response to the Cross-Motion on March 10, 2011.  This matter is now ripe for the Court's review.

## II.    STANDARD OF SUMMARY JUDGMENT REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c)(2).  A factual dispute is "material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating

the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325. Once the movant has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec., 475 U.S. at 586. "[T]he non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Moreover, the mere existence of some evidence in support of the nonmovant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. Anderson, 477 U.S. at 249-50.

Notably, "[t]he rule is no different where there are cross-motions for summary judgment." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). As stated by the Third Circuit, "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

## III.    DISCUSSION

### A.    Legal Standards for Review of Denial of Benefits Under an ERISA Plan

In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the United States Supreme Court held that, when evaluating challenges to denials of benefits in actions brought under 29 U.S.C. § 1132(a)(1)(B), district courts are to review the plan administrator's decision under a de

26

novo standard of review, unless the plan grants discretionary authority to the administrator or

fiduciary to determine eligibility for benefits or interpret the terms of the plan.  Id. at 115.  Thus,

when, as here,[2] discretionary authority is given to an administrator of a plan, a deferential standard

---

[2]  Plaintiff asserts, and Defendant agrees, that the Policy at issue granted Defendant "full discretion and authority to determine the eligibility for benefits and to construe and interpret all terms and provisions of the Plan policy."  (Compl. ¶ 7; Answer ¶ 7; see also Def.'s Mot. Summ. J. ¶ 5; Pl.'s Resp. Opp'n Mot. Summ. J. ¶ 5.)  While this Court's independent review of the Policy does not reveal any explicit or direct grant of authority to Defendant, the Court remains well aware that no magic words such as "discretion" need be used to accord such discretion. Luby v. Teamsters Health Welfare & Pension Trust Funds, 944 F.2d 1176, 1181 (3d Cir. 1991). Rather, "[d]iscretionary powers may be implied by a plan's terms even if not granted expressly." Id.  Indeed, language implying discretion may be "sprinkled throughout the plan."  Marx v. Meridian Bancorp, Inc. Long Term Disability Plan, No. CIV.A.99-4484, 2001 WL 706280, at *3 (E.D. Pa. Jun. 20, 2001), aff'd, 32 Fed Appx. 645 (3d Cir. 2002).  As persuasively observed by a sister court facing a similar policy:

> The inference of discretion that arises from the language of the Group Policy is more attenuated, but nonetheless reasonable, when viewing the policy as a whole. In particular, the language of the Group Policy provides that [the administrator] exercises the right to require "written proof of financial loss," and "a medical exam of any claimant as often as it may reasonably be required" prior to any award of benefits. . . .  Further, any continuing disability coverage is subject to "additional [written] proof [of loss] as often as we feel is necessary, within reason." . . . The court finds . . . that the import of language requiring medical exams "as often as reasonably may be required," or additional proof of loss "as we feel is necessary," establishes that proof of disability must be proven to [the administrator's] satisfaction before a claimant can continue to receive, or even qualify for, disability benefits. . . .  Thus, it is reasonable to conclude that the language of the Group policy implicitly reserves discretion to [the administrator] to determine a claimant's eligibility for benefits.

Russell v. Paul Revere Life Ins. Co., 148 F. Supp. 2d 392, 400-01 (D. Del. 2001).

The inference of discretion in the Plan at issue is similarly attenuated, but nonetheless reasonable.  The Plan clearly states that "[b]enefits for any other loss covered by this policy will be paid as soon as we receive *proper* written notice."  (Def.'s Mot. Summ. J., Ex. 3, at 16.)  It goes on to note that "[Provident] at [its] expense, [has] the right to have [insured] examined as often as is reasonable while a claim is pending."  (Id.)  Further, it provides that Provident can require proof of current and prior monthly income, working status, and "satisfactory proof of disability."  (Id. at 6, 9, 11, 14.)  Finally, the insured must authorize that his medical records can be disclosed to Provident.  (Id. at 17.)  The import of this language establishes that disability

of arbitrary and capricious is applied.  Id. at 111; Estate of Schwing v. Lilly Health Plan, 562 F.3d

522, 525 (3d Cir. 2009); Kalp v. Life Ins. Co. of N. Am., No. CIV.A.08-1005, 2009 WL 261189, at

*1 (W.D. Pa. Feb. 4, 2009).  In such cases, a court may overturn a plan administrator's decision only

if that decision is "without reason, unsupported by substantial evidence or erroneous as a matter of

law."  Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d. Cir. 2000), abrogated on

other grounds, Schwing, 562 F.3d at 525; see also Gillis v. Hoechst Celanese Corp., 4 F.3d 1137,

1141 (3d Cir. 1993) ("[W]hen the arbitrary and capricious standard applies, the decision maker's

determination to deny benefits must be upheld unless it was 'clear error' or 'not rational.'") (internal

quotation omitted).  "The scope of this review is narrow, and 'the court is not free to substitute its

own judgment for that of the defendants in determining eligibility for plan benefits.'"  Doroshow v.

Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009) (quoting Abnathya v.

Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993), cert. denied, 30 S. Ct. 1060 (2010)); see also

Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 (3d Cir. 2010); Brown v. First Reliance Standard

Life Ins. Co., No. CIV.A.10-486, 2011 WL 1044664, at *5 (W.D. Pa. Mar. 18, 2011).  Such a

deferential review "promotes efficiency by encouraging resolution of benefits disputes through

internal administrative proceedings rather than costly litigation."  Conkright v. Frommert, 130 S. Ct.

1640, 1649 (2010).

On a motion for summary judgment in an ERISA case where the plaintiff claims that

benefits were improperly denied, a reviewing court is generally limited to the facts known to the

plan administrator at the time the decision was made.  Post v. Hartford Ins. Co., 501 F.3d 154, 168

---

must be proven to Provident's satisfaction before a claimant can continue to receive benefits and
that Provident will not blindly pay out benefits absent satisfactory proof of disability.
Accordingly, the Court agrees with the parties that Defendant had discretion to determine
eligibility in this case, thereby subjecting its decision to the arbitrary and capricious standard of
review.

(3d Cir. 2007), <u>overruled on other grounds</u>, 574 F.3d 230 (3d Cir. 2009). "Consequently, when, as here, a plaintiff alleges that a plan administrator, such as [Provident], abused its discretion in deciding to terminate benefits, [the Court] generally limit[s] [its] review to the administrative record, that is, to the 'evidence that was before the administrator when [it] made the decision being reviewed.'" <u>Sivalingam v. Unum Provident Corp.</u>, 735 F. Supp. 2d 189, 194 (E.D. Pa. 2010) (quoting <u>Mitchell v. Eastman Kodak Co.</u>, 113 F.3d 433, 440 (3d Cir. 1997)); <u>see also</u> <u>Johnson v. UMWA Health & Ret. Funds</u>, 125 Fed. Appx. 400, 405 (3d Cir. 2005) ("This Court has made clear that the record for arbitrary and capricious review of ERISA benefits denial is the record made before the Plan administrator, which cannot be supplemented during the litigation.").

### B.    <u>Whether Defendant's Denial of Benefits Was Arbitrary and Capricious</u>

Given the foregoing standards, this Court must now determine whether Defendant's decision to deny Plaintiff disability benefits was arbitrary and capricious. Considering the entire record before Defendant at the time it made the decision – as set forth in detail above – the Court does not deem Defendant's decision to be in clear error.

In support of his claim that his arthritis and bilateral toe pain inhibited his ability to stand and walk and, thus, perform his prior employment, Plaintiff presented scant evidence. First, he submitted a claim form and written claimant statement describing his past treatment, indicating that he suffers extreme pain whenever he walks or stands, and asserting that, in light of this condition, he could no longer be an outside salesman of any kind. (Def.'s Mot. Summ. J., Exs. 5, 6, 12.) Second, he attached a statement from his treating podiatrist, David Baskwill, DPM, who remarked, with no further explanation, "No standing or walking for work. Weight bearing causes pain." (Def.'s Mot. Summ. J., Ex. 7.) Third, on March 10, 2009, Dr. Baskwill submitted a supplemental statement that indicated that Plaintiff's physical capabilities were "unknown," but that Plaintiff was "unable to return to work" and had limitations of "no standing or walking for work" because "weight bearing

causes pain." Finally, treatment records from Apple Hill Podiatry reflected Plaintiff's continued

reports of bilateral pain. (Def.'s Mot. Summ. J., Ex. 32.) In addition, Provident's own investigation

was similarly bare with respect to evidence supporting any limitations. Designated medical officer

Dr. Matheny noted that the surveillance video bolstered the fact that Plaintiff had abnormalities with

his gait and was limited to sedentary work. (Def.'s Mot. Summ. J., Ex. 46.) Further, Dr. Yablon

opined that Plaintiff would be limited to sedentary work from 2006 through to January 2009 – a

period before his claimed date of disability. (Def.'s Mot. Summ. J., Ex. 66.)

By contrast, the record is replete with evidence revealing a sound factual basis for

Defendant's finding of no disability under the terms of the Policy. Medically, Defendant collected

the following documentation:

- Dr. Stelmach, another of Plaintiff's treating podiatrists, provided a statement, dated December 30, 2008, which opined that Plaintiff had no restrictions or limitations, and could sit, stand, and walk eight hours per day. (Def.'s Mot. Summ. J., Ex. 7.) The statement also indicated that Plaintiff was advised to return to full time work as of January 16, 2008. (Id.)

- Treatment notes from Apple Hill Podiatry dated October 23, 2008, October 29, 2008, and November 11, 2008 indicated that Plaintiff was "doing good," "doing great," had decreased pain, and was mowing the lawn and walking. (Def.'s Mot. Summ. J., Ex. 14.)

- A January 2009 surveillance video suggested that Plaintiff had the ability to drive and walk in a smooth and fluid manner, while conducting various activities including shopping and loading bags into his car, playing with his dog, getting the mail, briefly jogging, and running various errands. (Def.'s Mot. Summ. J., Ex. 20.)

- Consultant Patricia Clermont, R.N. opined that there was little, if any, documentation to explain any functional restrictions or limitations during the period of December 2007 to October 2008. (Def.'s Mot. Summ. J., Ex. 21.) She would have given Plaintiff some standing and walking limitations only for a period of three weeks after both his surgery in December 2007 and his implant removal in October 2008. (Id.) "However, other than these two time periods noted, the medical records do not explain any other periods of functional R/L's . . . ." (Id.)

- Jerry D. Beavers, M.D. completed a doctoral review of Plaintiff's file on February 20, 2009 and agreed that restrictions and limitations on standing and walking would

be supported from the date of Plaintiff's first surgery on December 12, 2007 to the discharge on January 16, 2008, and from the date of his second surgery on October 17, 2008 to at least his visit on January 5, 2009. (Def.'s Mot. Summ. J., Ex. 22.) Nonetheless, Dr. Beavers found that current and ongoing restrictions and limitations were "unclear" and that Plaintiff's prognosis was "excellent for return to some ambulatory activity given that he is already ambulatory." (Id.)

- A canvass of twenty-four pharmacies near Plaintiff's home address, as well as a phone conversation with Plaintiff, revealed that Plaintiff took only Celebrex for pain, and only when he had to walk a lot. (Def.'s Mot. Summ. J., Ex. 28.)

- Dr. Beavers provided a follow-up doctoral review of Plaintiff's file on March 13, 2009, taking into consideration Dr. Baskwill's most recent statement. (Def.'s Mot. Summ. J., Ex. 30.) He found no support for the doctor's restriction of no standing or walking for work. (Id.)

- On April 8, 2009, Dr. Beavers spoke with Dr. Baskwill regarding Plaintiff's condition. (Def.'s Mot. Summ. J., Ex. 38.) Dr. Baskwill stated that although Plaintiff continued to complain of activity-associated pain in his foot, his examinations revealed no pathology in his feet that would explain that level of pain. Dr. Baskwill went on to note that his assessment of Plaintiff's restrictions and limitations was based solely on Plaintiff's own pain reports. (Id.; Def.'s Mot. Summ. J. Ex., 39.)

- Designated medical officer, G. Lance Matheny, II provided a report dated April 10, 2009, agreeing with Dr. Beavers that the restrictions and limitations provided by the podiatrist for no standing or walking at work were "restrictive in relation to the limited clinical findings management of pain with Celebrex, and the activities observed on the surveillance video." (Def.'s Mot. Summ. J., Ex. 41.) He found that from January 16, 2008 to the October 17, 2008 surgery, and from January 5, 2009 to the present, Plaintiff could engage in occasional standing and walking throughout the course of an eight-hour day, so as to avoid standing or walking for prolonged periods. (Id.)

- On May 21, 2009, Dr. Matheny indicated that he was of the opinion that Plaintiff could do sedentary work, including standing up to one-third of the day for a total of three hours a day, spread out over eight hours, but no more than one hour at a time. In addition, Plaintiff would have to use orthotics. (Def.'s Mot. Summ. J., Ex. 46.)

- Two more rounds of surveillance video showed Plaintiff traveling to a plastic surgery office and a YMCA, both of which he walked into after parking; retrieving a newspaper from his front driveway; taking in garbage cans; training his dog outside; driving to a dentist's office and dog kennel; taking his dog to a park near a reservoir where he stood and played fetch with his dog; walking back to his car from the reservoir with a steady and fluid gate for approximately five minutes; and standing

near the reservoir for an extended period talking to another individual.  (Def.'s Mot. Summ. J., Ex. 50.)

- Dr. Yablon opined, based on reasonable medical certainty that Plaintiff could "do the work described in [his] job description but he is able to stand and walk continuously for 3 hours twice during an 8-hour day and do sedentary work for 2 hours during an 8 hour day. . . . [The surgeries] should enable him to ambulate and to run slowly as was visualized on the surveillance videos."  (Id.)  (Def.'s Mot. Summ. J., Ex. 65.)  Dr. Yablon later confirmed that Plaintiff had restrictions and limitations requiring sedentary work from 2006 until October 17, 2008, when the prosthesis in his toe was removed.  (Def.'s Mot. Summ. J., Ex. 66.)  Giving Plaintiff three months of recovery, Dr. Yablon believed Plaintiff could return to his usual occupation in January 2009. (Id.)

Similarly, Provident's vocational review indicated that, even assuming Plaintiff had some standing/walking restrictions and limitations, Plaintiff's past job responsibilities did not exceed those restrictions.  More specifically:

- During a phone interview on January 19, 2009, Plaintiff admitted that his business, Bright Ideas, had not taken off and that it was only being kept open for a couple of clients.  (Def.'s Mot. Summ. J., Ex. 12.)

- Darrell Wilt, Plaintiff's sole client, noted that Plaintiff would work with him with his foot propped up, but continued to drive to his office regularly.  (Def.'s Mot. Summ. J., Ex. 13.)  He was not aware of any group presentations that Plaintiff was doing that would have involved standing.  (Id.)

- Bert Oberdick, chairperson of the York Rotary Club where Plaintiff did a lot of networking and purportedly significant standing, indicated that there were weekly lunches, prior to which there was networking time of only fifteen to thirty minutes. (Def.'s Mot. Summ. J., Ex. 33.)  Plaintiff also got involved with the York County Fair and a Mother's Day fair, sold tickets for the car wash committee, was a greeter, and did visitor introductions.  (Id.)

- Plaintiff's fiancee and business partner Karen Saxe stated that, as early as 2006, Plaintiff was physically unable to continue working due to his pain, but could not provide any details of Plaintiff's standing or walking activities.  (Def.'s Mot. Summ. J., Ex. 34.)

- Following a telephone conversation with Plaintiff on Mary 1, 2009, senior vocational rehabilitation consultant Robert Rodecker noted that Plaintiff's primary function at Bright Ideas was networking directed towards generating referrals.  (Def.'s Mot. Summ. J., Ex. 43.)  He also functioned as a "sales consultant" doing sales coaching

for various customers, and performed public relations tasks as well. (Id.) Plaintiff, however, conceded that the sales consulting work never really took off and never became a big part of what he did. (Id.) Also, in the first quarter of 2006, he significantly cut back on his networking activities due in large part to the struggling financial situation of the company. (Id.)

- In a follow-up analysis, Mr. Rodecker concluded that Plaintiff's work with Bright Ideas after 2006 was minimal and he did not play any significant role in the company thereafter. (Def.'s Mot. Summ. J., Ex. 52.) He further opined that given Dr. Matheny's restrictions of standing up to three hours a day and only an hour at one time with a limitation to sedentary work, "the physical demands of [Plaintiff's] occupational duties do not exceed the supported [restrictions and limitations] as indicated [by Dr. Matheny]." (Def.'s Mot. Summ. J., Ex. 54.)

Applying the arbitrary and capricious standard to this record, the Court cannot find that Defendant's decision to deny disability benefits to Plaintiff was without reason, unsupported by substantial evidence, or erroneous as a matter of law. Quite to the contrary, Defendant conducted a six-month long investigation, over the course of which it was continually obtaining new information from Plaintiff, his associates, his doctors, private investigators, medical professionals, and vocational experts. Aside from Dr. Baskwill's restriction of Plaintiff to no standing or walking for work – which the doctor conceded was based solely on Plaintiff's own complaints and not on any objective medical findings – the medical opinions available to Defendant did not support a finding of total disability from his duties at Bright Ideas. Indeed, even imposing the more restrictive limitations set forth by Drs. Matheny and Yablon, the vocational evidence suggested that nothing in Plaintiff's past work exceeded those limitations. Based on that comprehensive review, Defendant rationally determined that Plaintiff was not totally disabled within the meaning of the Plan and, therefore, reasonably denied Plaintiff's claim for long-term disability benefits. Accordingly, Defendant's denial of Plaintiff's claim for disability benefits under the Plan was entirely consistent with the record and is not subject to judicial reversal.

C.      **Plaintiff's Alleged Errors in Defendant's Disability Determination**

In an effort to rebut this conclusion, Plaintiff argues – by way of a Cross-Motion for Summary Judgment – that four errors[3] render Defendant's disability determination arbitrary and capricious.  The Court considers each allegation in turn.[4]

1.      **Whether Provident Improperly Disregarded the Opinions of Plaintiff's Treating Physicians**

First, Plaintiff argues that "Defendant ignored the restrictions imposed by Mr. Eppley's treating physician/surgeon, who clearly stated there would be no 'standing or walking for work.'" (Pl.'s Mem. Supp. Cross-Mot. Summ. J. 6.)  He goes on to note that even after direct consultation with Defendant's consulting physician, Mr. Eppley's surgeon confirmed that he was only capable of standing or walking for two one-half hour periods for the entire workday.  Id.

"[A] plan administrator is not required to give greater weight to the opinions of a claimant's treating physicians than to those of independent medical examiners."  Lamanna v. Special Agents Mut. Benefits Ass'n, 546 F. Supp. 2d 261, 289 (W.D. Pa. 2008).  As explicitly set forth by the

_____

[3]  Although Plaintiff lists them as three errors, closer review indicates that first argument actually sets forth two separate claims of error.

[4]  Defendant's Motion anticipates that Plaintiff will contend that Defendant's conflict of interest – being both the entity that funds the Plan and administers it – creates an abuse of discretion. The Supreme Court's 2008 decision in Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008) held that, while the existence of a conflict of interest, such as where "a plan administrator both evaluates claims for benefits and pays benefits claims," does not change the applicable standard of review, a reviewing judge must "take account of the conflict when determining whether the trustee, substantively or procedurally, has abused [its] discretion." Id. at 115.  Upon interpretation of Glenn, the Third Circuit has stated that, "courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion." Schwing, 562 F.3d at 525.

In the present case, although Defendant concedes a conflict of interest exists, Plaintiff neither identifies the conflict of interest nor intimates that this conflict had any impact upon the decision rendered in this case.  Accordingly, the Court need not address this issue.

United States Supreme Court, "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003). The Court went on to reason that

> the assumption that the opinions of a treating physician warrant greater credit than the opinions of plan consultants may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration, or when a specialist a consultant engaged by a plan may have an "incentive" to make a finding of "not disabled," so a treating physician, in a close case, may favor a finding of "disabled."

Id. at 832. Ultimately, the Court concluded that although plan administrators "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," it remains settled that "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. at 834.

In the case at bar, Defendant clearly did not ignore Dr. Baskwill's restrictions and limitations, but simply concluded, upon extensive review of the record, that such restrictions and limitations were unfounded. Dr. Baskwill's original statement imposing these limitations was a cursory checklist containing an unexplained statement of "No standing or walking for work. Weight bearing causes pain." (Def.'s Mot. Summ. J., Ex. 7.) Recognizing the lack of clear foundation for this statement, Defendant exercised its appropriate discretion and undertook to discern whether these limitations were accurate. First, it obtained treatment records from Apple Hill Podiatry, which noted Plaintiff's complaints of pain, but indicated that physical examinations and x-rays were unremarkable. (Def.'s Mot. Summ. J., Ex. 14.) Next, it consulted with both Ms. Clermont and Dr. Beavers, both of whom noted that while there was a history of reported pain, there was little, if any,

documentation to explain Dr. Baskwill's functional restrictions or limitations on Plaintiff. (Def.'s Mot. Summ. J., Exs. 21, 23.) Thereafter, Provident attempted to resolve the apparent discrepancy. Initially, during peer-to-peer contact with Dr. Beavers, Dr. Baskwill conceded that Plaintiff had no pathology in his feet to explain his reported level of pain and that his imposed limitations were based solely on Plaintiff's subjective reports – meaning that the doctor's first-hand medical observations of Plaintiff played no role in his opinion. (Def.'s Mot. Summ. J., Ex. 38.) Provident then turned to orthopedic surgeon Dr. Matheny, who, based on a comprehensive record, concluded that, "the restrictions and limitations provided by the podiatrist for no standing or walking at work were restrictive in relation to the limited clinical findings, management of pain with Celebrex, and the activities observed on the video." (Def's Mot. Summ. J., Ex. 41.) Finally, following Plaintiff's appeal of the original denial of benefits, Defendant turned to yet another medical expert, Dr. Yablon, who likewise eschewed Dr. Baskwill's limitations and found that, as of January 2009, Plaintiff could stand and walk continuously for three hours twice during an eight-hour day and do sedentary work for two hours during an eight-hour day. (Def.'s Mot. Summ. J., Ex. 65.)

In short, far from ignoring Dr. Baskwill's unexplained restrictions, Provident repeatedly sought some evidentiary basis for either accepting or rejecting them. Ultimately, Defendant's decision to disregard his report was well-grounded in substantial evidence of record. Given such a thorough review by Defendant and the presence of competing opinions, the Court finds no clear error in Defendant's refusal to accord Dr. Baskwill's opinion any deference. See Watson v. Metro. Life Ins. Co., No. CIV.A.05-3481, 2007 WL 2029291, at *4 (E.D. Pa. July 11, 2007) ("the fact that MetLife accorded greater weight to its reviewing physicians than to [Plaintiff's] treating physicians does not make its decision to deny plaintiff's long-term disability benefits arbitrary and capricious.").

### 2. Whether Provident Improperly Ignored Mr. Eppley's Job Requirements

Plaintiff's second allegation of error contends that Defendant's consulting vocational experts "simply regurgitated the requirements for someone to perform a 'sedentary' job and simply ignored Mr. Eppley's job requirements." Plaintiff provides no further elaboration on this argument.

This contention simply has no merit. Defendant undertook a thorough and detailed investigation into Plaintiff's job requirements. It obtained a comprehensive business report on Plaintiff's company; spoke directly with Plaintiff as to his job requirements; conducted telephone interviews with Plaintiff's business partner, two current clients, and the head of the Rotary Club where Plaintiff networked; and repeatedly consulted with vocational expert Robert Rodecker, who also conducted his own interviews and investigation. Plaintiff flatly admitted that the Bright Ideas business was never successful, that he had tapered off many of his sales consulting and marketing activities due to the struggling financial situation of the company, and that he was never able to generate income for the work he put in. (Def.'s Mot. Summ. J., Ex. 43.) Other than Plaintiff's own statements, not one piece of evidence suggested either that Plaintiff's networking and sales duties required any more than limited amounts of standing and/or walking, or that Plaintiff could not perform those functions with the accommodations proposed by the various medical reviewers. Based on the entirety of the record, and only after engaging in significant amounts of independent information-gathering, did Mr. Rodecker opine that the demands of Plaintiff's occupational duties did not exceed the medically-imposed limitations. In light of this record, the Court finds no merit to Plaintiff's claim that Mr. Rodecker "simply regurgitated" the requirements of sedentary work.

### 3.    Ignoring Plaintiff's Subjective Complaints of Pain

In the third alleged error, Plaintiff argues that Defendant ignored his subjective complaints of pain and disability. Without any citation to the record, Plaintiff contends that "[t]he record shows that Mr. Eppley has struggled with this degenerative, debilitating condition since 1997. With his third surgical procedure, it simply got to the point where the physical restrictions and pain rendered

him unable to perform the substantial material duties of his occupation." (Pl.'s Mem. Supp. Cross-Mot. Summ. J. 8.) Plaintiff goes on to assert that Defendant recognized that Plaintiff had physical restrictions and limitations from his condition, but "they have apparently ignored the significant fact that pain would be a constant component of Mr. Eppley's occupation." (Id. at 8-9.)

Debilitating pain can qualify as a disability. Zurawel v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson, No. CIV.A.07-5973, 2010 WL 3862543, at *17 (D.N.J. Sept. 27, 2010). Nonetheless, where claims as to the existence or degree of subjective pain are unsubstantiated, the plan administrator has the discretion to disregard them. Id.; see also Dolfi v. Disability Reins. Mgmt. Servs., Inc., 584 F. Supp. 2d 709, 735 (M.D. Pa. 2008) (medical consultants' findings that the plaintiff's subjective complaints of pain are inconsistent with the objective evidence available is not arbitrary and capricious).

Defendant clearly had a sound basis for discrediting the degree of pain alleged by Plaintiff. First, "an Administrator may consider a lack of objective evidence when evaluating a claim for ERISA benefits." Cloud v. PNC Fin. Servs. Group., Inc., No. CIV.A.06-1066, 2009 WL 255631, at *4 (E.D. Pa. Jan. 30, 2009). All the physicians agreed that although Plaintiff suffered from a degenerative arthritic condition in his big toes, the state of that condition would not support the extent of Plaintiff's complained-of pain. Indeed, Plaintiff's own doctor indicated that he could find no pathology in Plaintiff's feet.

Second, despite complaints of debilitating pain, Plaintiff was prescribed only Celebrex, 200 mg, up to twice a day. As of his December 20, 2008 statement, Plaintiff was taking it one time per day or as needed. (Def.'s Mot. Summ. J., Ex. 5.) A canvass of pharmacies in March 2009 revealed that Plaintiff had filled the prescription once on November 22, 2008 and once on February 15, 2009. (Def.'s Mot. Summ. J., Ex. 28.) Finally, in a March 2009 telephone interview, Plaintiff admitted that he only took Celebrex when he had to walk a lot. At the very least, such limited use of pain

medication suggested that his pain was not as restrictive as he stated.

Third, Defendant conducted multiple days of surveillance on Plaintiff in both January and June 2009. The resulting videos substantially undermined Plaintiff's complaints of pain. During the course of the videos, Plaintiff engaged in numerous activities involving walking or standing. Although his gait was often awkward, he maintained a smooth, consistent pace and never used any assistive devices. He played with his dog from a standing position, walked around a reservoir while carrying a folding chair and his dog's leash, calmly conversed on a cell phone while walking, briefly jogged from his mailbox at the curb to his front door, and loaded grocery bags into his car. At no point did he display any outward signs of pain.

Finally, Defendant did not completely ignore Plaintiff's pain complaints. Despite the fact that all the doctors of record indicated that Plaintiff had no foot objective condition, Provident nonetheless found that Plaintiff had some limitations and restrictions in light of his complaints of pain.

In sum, none of the evidence presented by Plaintiff established that the pain he suffered was so debilitating as to prevent him from performing the essential functions of his job at his company, which included networking, sales consulting, and marketing. Accordingly, the Court declines to find Defendant's decision arbitrary and capricious on this ground.

**4.    Reliance on Surveillance Video**

In a final effort to inject arbitrariness into Defendant's benefits decision, Plaintiff asserts that Defendant "unduly relied on surveillance film which showed Mr. Eppley able to perform some physical tasks for very brief periods of time." (Pl.'s Mem. Supp. Cross-Mot. Summ. J. 6.) He goes on to assert that the videos are merely "brief glimpses" of him standing and/or walking and "there is no rational connection in extrapolating the scenes on the film and [then] opining that Mr. Eppley can stand/walk for three continuous hours at a time." (Id. at 9.)

39

Third Circuit jurisprudence is clear that video surveillance remains a proper method of investigating disability insurance claims. Russell v. Paul Revere Life Ins. Co., 288 F.3d 78, 81 (3d Cir. 2002); see also Kearney v. Aetna Life Ins. Co., No. CIV.A.04-4246, 2006 WL 293493, at *8 (E.D. Pa. Feb. 6, 2006). In fact, where a surveillance video indicates that a claimant's physical limitations do not match either his own description of his limitations or the opinion of his treating physicians, courts have been reluctant to deem a defendant's denial of benefits arbitrary and capricious. DeLong v. Aetna Life Ins. Co., No. CIV.A.05-3371, 2006 WL 328398, at *4 (E.D. Pa. Feb. 9, 2006), aff'd, 232 Fed. Appx. 190 (3d Cir. 2007).

Plaintiff's argument, in this case, is misplaced. Nothing in the record suggests that Defendant "unduly" relied on these videos. Rather, they simply became part of a much larger record including interviews with Plaintiff, interviews of Plaintiff's colleagues, treatment records, physical therapy records, treating physician statements, medical consultant statements, vocational expert reports, pharmacy surveys, and peer-to-peer consultation. Moreover, although Plaintiff contends that the surveillance videos do not show his ability to stand for three hours at a time, (Pl.'s Mem. Supp. Cross-Mot. Summ. J. 7), he fails to acknowledge the remarkable absence of evidence supporting his claimed inability to stand or walk for more extended periods. Kearney, 2006 WL 293492, at *8 ("[A]n insurance company is under no duty to conduct its own investigation or gather more information as long as its decision based upon the information available is not arbitrary and capricious."). The surveillance video merely goes to address Plaintiff's repeated complaints, made throughout the record, that any amount of standing or walking causes him pain and that he would not be able to perform his prior job functions. (See, e.g., Def.'s Mot. Summ. J., Ex. 6 ("When I walk or stand, I experience pain. The longer I walk or stand, the worse the pain becomes."); Def.'s Mot. Summ. J., Ex. 12 (Plaintiff claims in interview that he is "[u]nable to walk or stand due to pain.").) Taking the video in conjunction with the remainder of the record, Defendant maintained a

more than reasonable basis on which to find Plaintiff not totally disabled.

## IV. CONCLUSION

Reviewing the entirety of the record available at the administrative level, the Court is satisfied that Defendant's refusal to provide benefits to Plaintiff under the terms of his Policy was not arbitrary and capricious. Because the Plan accorded Defendant discretionary authority to make disability decisions, the Court was required to apply a deferential standard of review. Viewing the available evidence through such a lens reveals no portion of the decision which could be deemed to be "without reason, unsupported by substantial evidence or erroneous as a matter of law." Pinto, 214 F.3d at 387. Quite to the contrary, the evidence suggests that Defendant conducted a detailed, thorough, and comprehensive review in order to create a medical and vocational profile of Plaintiff that was both fair and accurate. Simply because Plaintiff is now dissatisfied as a result does not mean that he has met his burden to prove either "total disability" as defined by his Policy or that Defendant abused its discretion in reaching its decision.

Accordingly, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment. Judgment will be entered in favor of Defendant on the entirety of the Complaint and Plaintiff's case will be dismissed. An appropriate order follows.